# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JAMES MASON and JOANNE PEARSON, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-10-S-02794-NE |
| | ) | |
| CITY OF HUNTSVILLE, ALABAMA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, James Mason and Joanne Pearson, filed this case on October 18, 2010, asserting claims against the City of Huntsville, Alabama, for injunctive relief, attorney's fees, and costs pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("the ADA") and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. ("the Rehabilitation Act").[1]  The case currently is before this court on defendant's motion to dismiss, filed pursuant to Federal Rule of Civil Procedure 12(b)(6), for allegedly failing to state a claim upon which relief can be granted.[2]  Due to the nature of plaintiffs' claim, and the City of Huntsville's challenge to the constitutionality of the ADA, the court certified the constitutional question and, in

---

[1] Doc. no. 1 (Complaint).

[2] Doc. no. 5.

accordance with 28 U.S.C. § 2403(a), notified the United States Attorney General.[3] The United States elected to intervene, and filed a brief in support of plaintiffs and as *amicus curiae*.[4]   Upon consideration of the complaint, motions, and briefs, this court concludes that the defendant's motion is due to be granted in part and denied in part.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6), which permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted," must be read in conjunction with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While that pleading standard does not require "detailed  factual allegations," *Bell Atlantic Corp. v. Twombly*, 544 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  [*Twombly*, 550 U.S., at 555].  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  *Id*., at 557.

---

[3] Doc. no. 12.

[4] Doc. no. 21.

To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id*., at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*., at 556.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*., at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*., at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id*., at 556.  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  490 F.3d, at 157-158.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they

3

are no more than conclusions, are not entitled to the assumption of truth. While *legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations*, *a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis supplied).

When ruling upon a motion to dismiss, the court must assume that all well-pleaded facts alleged in the complaint are true. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (1994) (stating that on a motion to dismiss, the court must "accept as true the factual allegations in the amended complaint"); *Marsh v. Butler County*, 268 F.3d 1014, 1023 (11th Cir. 2001) (*en banc*) (setting forth the facts in the case by "[a]ccepting all well-pleaded factual allegations (with reasonable inferences drawn favorably to Plaintiffs) in the complaint as true"). Accordingly, the statements contained in the following part of this opinion as the relevant "facts" for Rule 12(b)(6) purposes may, or may not, be the actual facts. *See, e.g.*, *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1281 n.1 (11th Cir. 2006).

## II. SUMMARY OF FACTS

Plaintiffs, James Mason and Joanne Pearson, are residents of Huntsville, Alabama.[5] Both require the use of wheelchairs for mobility, and both have limited use

---

[5] Complaint ¶¶ 3-4.

of their upper extremities.[6]  Defendant, the City of Huntsville, Alabama, is a municipal

corporation that owns, operates, and maintains the facilities and premises at issue in

this case.[7]  The locations at issue are:

1.  City sidewalks, curb ramps, and parking;

2.  The Public Services Building;

3.  The Huntsville Municipal Complex;

4.  The Historic Huntsville Depot;

5.  Sandhurst Park;

6.  Brahan Spring Park Natatorium;

7.  Joe Davis Stadium;

8.  Mastin Lake Park;

9.  Lakewood Community Center;

10.  Dr. Richard Showers Sr. Recreation Center and Pool; and,

11.  The Burritt Museum.[8]

 Both plaintiffs visited the various premises at issue and were "denied full, safe and

equal access to the subject property due to the lack of compliance with the ADA."[9]

---

[6] *Id.*

[7] *Id.* ¶ 5.

[8] *Id.* ¶ 5.  The locations, addresses, and exact deficiencies of the facilities and premises are described in detail in ¶¶ 5 and 29 of plaintiffs' complaint.

[9] *Id.* ¶¶ 3-4.

Plaintiffs assert their desire and intent to visit these facilities in the future, but allege that they will be "denied full, safe and equal access due to the barriers to access that continue to exist."[10]

Plaintiffs assert that the City of Huntsville is in violation of the ADA, specifically Title II and various regulations under the Act.[11]  Plaintiffs also assert that defendants are in violation of § 504 of the Rehabilitation Act and its underlying regulations.[12]  *See* 29 U.S.C. §794 *et seq*.; 34 C.F.R. §104 *et seq*.  To remedy these violations, plaintiffs seek a declaration that defendant is in violation of the ADA and the Rehabilitation Act, an injunctive order directing defendant to bring the facilities enumerated above into compliance with those acts, and reasonable fees and costs.[13]  Plaintiffs also seek, in specific reference to their Rehabilitation Act claim, "that Huntsville undertake a self-evaluation" of its programs, policies, and practices that could affect individuals with disabilities.[14]

### III. ANALYSIS

Defendant initially contends that plaintiffs' Rehabilitation Act claim must fail because of plaintiffs' failure "to adequately allege that the *particular* City 'programs'

---

[10] *Id*.

[11] Complaint ¶¶ 8-30.

[12] *Id*. ¶¶ 34-39.

[13] *Id*. ¶ 32.

[14] *Id*. ¶ 39.

or 'activities' at issue, if any, receive federal funds."[15]  The United States intervened in support of plaintiffs' position, and suggested that this court address the Rehabilitation Act first, because "the answer may obviate the need to consider the city's constitutional challenge."[16]

A.    **Is Plaintiffs' Claim Under § 504 of the Rehabilitation Act Sufficiently Pled to State a Claim?**

Section 504 of the Rehabilitation Act states, in the part pertinent to the following discussion, that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any *program or activity receiving Federal financial assistance* . . . .

29 U.S.C. § 794(a) (emphasis supplied).  The statute goes on to define the term "program or activity" as including

> all of the operations of —
>
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local

---

[15] Doc. no. 6, at 4.

[16] Doc. no. 21, at 7.

government . . .

any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).

In July of 1981, the former Fifth Circuit interpreted the phrase "program or activity receiving Federal financial assistance" in the context of a potentially insufficient pleading in the case of *Brown v. Sibley,* 650 F.2d 760 (5th Cir. 1981).[17] The Court held that

> it is not sufficient, for purposes of bringing a discrimination claim under section 504, simply to show that some aspect of the relevant overall entity or enterprise receives or has received some form of input from the federal fisc. A private plaintiff in a section 504 case must show that the program or activity with which he or she was involved, or from which he or she was excluded, itself received or was directly benefitted by federal financial assistance.

*Brown*, 650 F.2d at 769.

While it would seem that *Brown* would be binding authority on the issue at hand, there is significant disagreement among the Circuit Courts of Appeal about whether *Brown* was overturned by the changes wrought in the Rehabilitation Act by the Civil Rights Restoration Act of 1987 ("the Restoration Act").  Before the Restoration Act, the Supreme Court had "interpreted the Rehabilitation Act to apply

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

8

only to specific programs that received federal financial aid," but not to other programs in the same institution that received no aid. *See*, *e.g.*, *Innovative Health Systems, Inc. v. City of White Plains*, 931 F. Supp. 222, 234 (S.D. N.Y. 1996) (citing *Grove City College v. Bell*, 465 U.S. 555, 602-03 (1984); *Consolidated Rail Corp. v. Darrone* 465 U.S. 624, 636 (1984)). Congress enacted the Restoration Act "to restore the broad, institution wide application of the four civil rights statutes, including the Rehabilitation Act." *American Association of People with Disabilities v. Smith*, 227 F. Supp. 2d 1276, 1293 (M.D. Fla. 2002). Section 794(b), as quoted above, is the result of the Restoration Act.

The Tenth Circuit and various district courts have held that the Restoration Act overturned the decision in *Brown*, just as it did the decisions in *Grove City College* and *Darrone*. *See Bentley v. Cleveland County Bd.*, 41 F.3d 600 (10th Cir. 1994); *Innovative Health Systems*, 931 F. Supp. at 234 (citing *Bentley*); *American Association of People with Disabilities*, 227 F. Supp. 2d at 1293; *Corrales v. Moreno Valley Unified School Dist*rict, No. 08-00040-AC, 2010 WL 2384599, *9 (C.D. Cal. June 10, 2010). According to those courts, the Restoration Act lowered the pleading standard for private Rehabilitation Act plaintiffs, no longer requiring them to include the specific program receiving federal funding in their allegations.

For example, in the Middle District of Florida case styled *American Association*

*of People with Disabilities v. Smith*, *supra*, the plaintiffs merely alleged that the "[d]efendants [*i.e.*, the supervisor of city elections, and, members of the city council] are an instrumentality of a local government that is a recipient of federal financial assistance." *American Association of People with Disabilities,* 227 F. Supp. 2d at 1293 (quoting the complaint) (alterations supplied). The district court reasoned that, "[s]ince a program or activity includes all of the operations of an instrumentality of local government, the Rehabilitation Act is applicable if an instrumentality of local government receives federal financial assistance." *Id*. ( alteration supplied). Thus, the court found the plaintiffs' pleading to be sufficient. *Id*.

However, that line of reasoning conflates the application of the Rehabilitation Act with the requirements of pleading. Those cases also pre-date the heightened pleading standards imposed under *Twombly* and *Iqbal*, which require more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Most importantly, the Eleventh Circuit disagrees. Both the present Fifth and Eleventh Circuits have continued to apply the rationale of the *Brown* decision to Rehabilitation Act claims filed *after* the Restoration Act altered the language of the Rehabilitation Act. *See Lightbourn v. County of El Paso*, 118 F.3d 421, 427 (5th Cir. 1997); *Doyle v. University of Alabama in Birmingham*, 680 F.2d 1323 (11th Cir. 1982); *Muckle v. UNCF*, 420 F. App'x. 916, 918 (11th Cir. 2011).

In *Doyle*, the plaintiff's claim against the University of Alabama was based on the idea that the defendant was prohibited from discriminating against her disability "simply because it was a recipient of federal funds."  680 F.2d at 1326.  The Eleventh Circuit, quickly recognizing and following the precedential rule set in *Brown*, dismissed Doyle's claim because Doyle did not "allege that the program by which she was employed was directly benefitted by federal financial assistance." *Id.* at 1327 (internal quotations omitted).

The Eleventh Circuit's recent decision in *Muckle* — even though an unpublished opinion and, therefore, not precedential authority — nevertheless followed the line of reasoning established in *Brown* and reiterated in *Doyle*.  The Court held that the plaintiff was required to allege in his complaint that the specific program in which he participated "received federal financial assistance." *Muckle*, 420 F. App'x at 918.[18]

The plaintiffs in the present case allege that the "defendant is the direct recipient of federal funds sufficient to invoke the coverage of Section 504."[19]  While plaintiffs

---

[18] The *Muckle* opinion still is persuasive authority.  *See* 11th Cir. R. 36-2; *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1138 n. 4 (stating that "unpublished opinions are not binding precedent but they may be cited as persuasive authority.")

[19] Complaint ¶ 36.  Even if the court were operating under the Tenth Circuit's precedent, in which *Brown* is inapplicable, there is significant question about whether plaintiffs' allegations would survive the current *Iqbal* and *Twombly* pleading standards.  Regardless, this court follows the Eleventh Circuit, in which *Brown* is still of precedential value, and can compare plaintiffs' pleading with those of *Doyle* and *Muckle*.

thus alleged the existence of federal funding, which is more than what was alleged by the plaintiffs in the *Muckle* case, the present complaint still does not allege that the city-owned and operated facilities and premises at which plaintiffs were denied full, safe, and equal access "received or [were] directly benefitted by federal financial assistance." *Doyle*, 680 F.2d at 1326-1327 (quoting *Brown*, 650 F.2d at 769) (alteration supplied). Accordingly, this court finds that plaintiffs' claim under § 504 of the Rehabilitation Act is due to be dismissed for failure to state a claim upon which relief can be granted.

**B.** **As Applied in this Case, Is Title II of the Americans with Disabilities Act a Valid Exercise of Congressional Power?**

The ADA was enacted in 1990 with the stated purpose of creating "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA governs discrimination in the provision of public services, and states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the *services, programs, or activities of a public entity*, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis supplied). The term "public entity" includes "any State or local government," as well as "any department, agency, special purpose district, or other

instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

A private plaintiff alleging a violation of Title II has the burden of proving three elements:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*American Association of People with Disabilities v. Harris*, 647 F.3d 1093, 1101 (11th Cir. 2011) (quoting *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007)).  When passing the ADA, Congress stated its specific intent "to invoke the sweep of congressional authority, *including the power to enforce the fourteenth amendment and to regulate commerce*, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4) (emphasis supplied).  Despite that clear statement of Congressional intent, defendant challenges the application of Title II of the ADA in this case as an invalid exercise of Congressional power, both under the Fourteenth Amendment and the Commerce Clause.

Notably, defendant is not asserting immunity under the Eleventh Amendment.[20] While the relevant case law regarding the constitutionality of the ADA is often

---

[20] Doc. no. 18, at 3.

triggered by assertions of immunity, the question of whether Congress had "the power to abrogate the states' immunity from suit is a different question from whether the substantive provisions of the ADA are a valid exercise of Congress's power." *Nelson v. Miller*, 170 F.3d 641, 648 (6th Cir. 1999). Even so, the ADA cases triggered by an Eleventh Amendment challenge are still instructive.

The test for valid abrogation of a state governmental entity's immunity under the Eleventh Amendment is a two-step process. First, the court must ask whether Congress intended to abrogate state immunity. *University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). If so, the second question is whether the act was "pursuant to a valid grant of constitutional authority." *Id.* (quoting *Kimel v. Florida Board of Regents*, 528 U.S. 62, 73 (2000). Even though immunity is not at issue in the present case, it still is necessary to determine whether Congress validly enacted the ADA pursuant to "one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000). The two potential bases of enumerated powers at issue this case are the Commerce Clause of Article I,[21] and the enforcement provision of the Fourteenth Amendment.[22]

**1.    Is Title II a valid exercise of Congressional power under the**

---

[21] U.S. Const. art. I, § 8, cl. 3 ("Congress shall have Power To . . . regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes; . . .") (1787).

[22] U.S. Const. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.") (1868).

### Fourteenth Amendment?

When invoking the Fourteenth Amendment as a basis for enacting the ADA, Congress was utilizing its enforcement power under Section 5 of that Amendment, which provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  The Supreme Court acknowledged that Section 5 is "a positive grant of legislative power." *Katzenback v. Morgan*, 384 U.S. 641, 651 (1966). Congress is thus given the power to promulgate laws prohibiting or providing remedies for "constitutional violations . . . even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)).  The Court has thus interpreted Section 5 as giving Congress a broad scope of power:

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Boerne*, 521 U.S. at 517-518 (internal citations omitted).

Even so, the power granted to Congress by Section 5 is not without limitations. "Congress does not enforce a constitutional right by changing what the right is.  It has

been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *Id.* at 519.   In short, this power is "remedial," not substantive. *See id.*   The test which the Supreme Court has adopted to determine whether legislation is remedial or substantive is one of "congruence and proportionality." *Id.* at 520 ("There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.").   That test implicates three issues for analysis by a court, *i.e.*:

> (1) the constitutional right or rights that Congress sought to enforce when it enacted the ADA; (2) whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary; and (3) whether Title II is an appropriate response to this history and pattern of unequal treatment.

*Association for Disabled Americans, Inc. v. Florida International University*, 405 F.3d 954, 957 (11th Cir. 2005) (hereinafter "*FIU*") (quoting *Garrett*, 531 U.S. at 365-370).   Additionally, a court applying the test must "consider the harm to be prevented on a 'claim-by-claim basis.'" *Gaylor v. Georgia Department of Natural Resources*, No. 2:11–CV–288–RWS, 2012 WL 3516489, *3 (N.D. Ga. Aug. 15, 2012) (citing *United States v. Georgia*, 546 U.S. 151, 159 (2006)).

Therefore, the relevant question here is whether Title II of the ADA is a valid exercise of Congress's Section 5 enforcement power.   For the beginning step of the analysis — *i.e.,* determining " the constitutional right or rights that Congress sought

16

to enforce" — there are two relevant categories of cases. The first category, encompassing those cases in which the plaintiff "seeks to enforce the Fourteenth Amendment's 'prohibition on irrational discrimination,'" are examined under rational basis review. *FIU*, 405 F.3d at 957. Naturally, all valid claims under Title II will include discrimination against a disabled plaintiff and, thus, will trigger at least rational basis review. The second category of authorities, however, narrows the first category to a smaller field of cases involving disability discrimination that inherently impacts heightened constitutional rights, thereby requiring a "more searching judicial review." *Id.* (citing *Tennessee v. Lane*, 541 U.S. 509, 539 (2004)). For example, the *Lane* case addressed access barriers that prevented disabled persons from taking part in court proceedings — barriers that, in turn, affected their fundamental rights under the Due Process and Confrontation Clauses. *Lane,* 541 U.S. at 530; *see also FIU,* 405 F.3d at 957. The holding in *Lane* was explicitly limited "to the class of cases implicating the accessibility of judicial services." *Lane*, 541 U.S. at 530.

It is true that other circuits and districts have narrowed the scope of valid Title II claims solely to those implicating a fundamental right.[23] Even so, the Eleventh Circuit has not followed that path. In *FIU*, the Eleventh Circuit upheld the ADA under Section 5 "as applied to access to public education." *FIU,* 405 F.3d at 958. The court

---

[23] *See* doc. no. 31, at 24.

admitted that public education is not a "fundamental right," but nevertheless distinguished it from other rights that warrant only rational basis review by characterizing public education as "vital to the future success of our society." *Id*. The Eleventh Circuit's decision in *FIU* is consistent with the Supreme Court's holding in *United States v. Georgia,* 546 U.S. 151 (2006). There, the Court found that Section 5 validly created private remedies for actual Fourteenth Amendment violations, but it left open the question of whether claims for Title II violations that did *not* independently violate the Fourteenth Amendment were "nevertheless valid." *Id*. at 159. Additionally, the Supreme Court has recognized that Congress's Section 5 power allows it to prohibit "a somewhat broader swath of conduct, including that which is not itself forbidden by the [Fourteenth] Amendment's text." *Kimel v. Board of Regents*, 528 U.S. 62, 81 (2000). Thus, this court concludes that Congress intended for the scope of the ADA to reach past solely fundamental rights.

In the present case, plaintiffs allege Title II violations at eleven locations within the City of Huntsville. Plaintiffs' claims can logically be divided into three categories for analysis: (1) sidewalks, curb ramps, and parking;[24] (2) municipal administration

---

[24] This category includes the City sidewalks, curb ramps, and parking enumerated as item number 1 on page 5 of this opinion.

18

facilities;[25] and (3) entertainment and recreation venues.[26]

### a.     Sidewalks, curb ramps, and parking

In order to determine whether the application of Title II to city sidewalks, curb ramps, and parking is a valid exercise of Section 5 enforcement power, this court must first determine the scope of the rights at issue.

### i.     Constitutional right at issue

The preliminary inquiry is whether sidewalks, curb ramps, and parking areas (collectively referred to hereinafter as "sidewalks") that are unconnected to any City program, service, or activity can properly be regulated by Title II.  While the Eleventh Circuit has not addressed the issue, both the Ninth and Fifth Circuits have interpreted the ADA broadly, as covering "anything a public entity does." *Barden*, 292 F.3d at 1076.[27]  Though Congress did not provide a definition of the phrase "services, programs, or activities" within the ADA, the definition of a similar term from the

---

[25] This category includes the Public Services Building and Huntsville Municipal Complex enumerated as item numbers 2 and 3, respectively, on page 5 of this opinion.

[26] This category includes items 4-11 from page 5 of this opinion: *i.e.,* the Historic Huntsville Depot; Sandhurst Park; Brahan Spring Park Natatorium; Joe Davis Stadium; Mastin Lake Park; Lakewood Community Center; Dr. Richard Showers Sr. Recreation Center and Pool; and the Burritt Museum.

[27] At the time the complaint was filed in the instant case, defendant relied heavily on the Fifth Circuit's opinion that Title II could not be applied to sidewalks unconnected to a "program, service, or activity."  *Frame v. City of Arlington*, 616 F.3d 476 (5th Cir. 2010) ("*Frame I*").  However, a rehearing *en banc* in the Fifth Circuit changed the opinion on this issue, bringing the Fifth Circuit into line with the Ninth Circuit's view.  *See Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (*en banc*) ("*Frame II*"); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076-77 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003).

Rehabilitation Act is instructive.[28]   The Rehabilitation Act defines "program or activity" as meaning "all of the operations of" the local government. 29 U.S.C. § 794(b).  Using that definition to determine the meaning of the statute, the Fifth Circuit has phrased the relevant question as whether the sidewalks "are benefits of 'all of the operations' and 'services' of a public entity within the ordinary meaning of those terms."  *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011) (*en banc*) ("*Frame II* ").[29]  This court finds the opinions of the Fifth and Ninth Circuits to be persuasive, and finds that the ADA's broad mandate to eliminate discrimination against disabled persons includes public sidewalks, curb ramps, and parking areas.[30] Additionally, the legislative history of the ADA supports that interpretation.  The

---

[28] The Rehabilitation Act is often referenced to provide definitions and context to Title II of the ADA.  *Barden*, 292 F.3d at 1076-1077 (citing H.R.Rep. No. 101-485(II), at 84 (1990)); *Frame II*, 657 F.3d at 223; *cf*. 42 U.S.C. 12133 (providing that "[t]he remedies, procedures, and rights" available under the Rehabilitation Act "shall be the remedies, procedures, and rights" available under Title II) (alteration supplied).  The Eleventh Circuit agrees that the two statutory schemes involve the "same standards." *Allmond v. Akal Security, Inc.*, 558 F.3d 1312, 1316 n. 3 (11th Cir. 2009) ("We discuss those claims together and rely on cases construing those statutes interchangeably.").

[29] *See supra* note 27.

[30] Both defendant and the United States refer to a potential distinction between treating the act of building and altering a sidewalk as a service, as opposed to the existence of the sidewalk *itself* as the service.  The Fifth Circuit's *en banc* opinion following rehearing of the panel decision in *Frame I* determined that such a distinction is not relevant. *See Frame II,* 657 F.3d at 226-229.  If the "service" is the act of building and altering the sidewalk, curb, or parking lot, this easily falls into the Rehabilitation Act definition of "all of the operations" of the qualified public entity. *Id.* at 227. Alternatively, if the sidewalk or parking lot itself is the service, and it is "unnecessarily made inaccessible to individuals with disabilities, those individuals are denied the benefits of safe transportation and a venerable public forum." *Id.* at 228 (citing *Boos v. Barry*, 485 U.S. 312, 318 (1988); *Everson v. Board of Education of Ewing,* 330 U.S. 1, 17-18 (1947)).

House Report states that

> activities which do not fit into the employment or public
> accommodations context are governed by the analogous section 504
> regulations. For example, under this title, local and state governments
> are *required to provide curb cuts on public streets*. The employment,
> transportation, and public accommodation sections of this Act would
> be meaningless if people who use wheelchairs were not afforded the
> opportunity to travel on and between the streets.

H.R. Rep. 101-405, part 2, at 84 (emphasis supplied).  It is important to note,
however, that the foregoing language applies only to "curb cuts on public streets."
The  regulations governing sidewalks, curb ramps, and parking areas only became
effective on January 26, 1992.  Pub. L. No. 101-336 § 205(a) (codified as amended at
42 U.S.C. §§ 12131-12165).  The relevant regulation here is 28 C.F.R. § 41.58(a),
which requires new and altered "facilities" to be accessible "to the maximum extent
feasible."  The term "facility" includes "roads, walks, [and] parking lots." 28 C.F.R.
§ 41.3(f) (alteration supplied).

   The next question that must be addressed by this court is whether the denial of
access to "newly built or altered" public sidewalks, curb ramps, and parking lots (*i.e.,*
ones constructed after January 26, 1992) implicates rational basis review, or "a more
searching judicial review." *FIU*, 405 F.3d at 957 (citing *Tennessee v. Lane*, 541 U.S.
509 (2004)).  The primary function of sidewalks, ramps, and parking areas (*i.e.,* lots

or garages) is to facilitate the public transportation of people, goods, and commerce.[31] The Supreme Court has also noted that public sidewalks are "traditional public fora that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Boos v. Barry,* 485 U.S. 312, 318 (1988) (quoting *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515 (1939) (Roberts, J.)).  Plaintiffs referred briefly to these First Amendment rights in their response to defendant's motion to dismiss, *but they did not plead facts in their complaint* that support a violation of any fundamental rights due to hindered access to these "public fora."  The court can only draw inferences based on the facts actually pled; and here, plaintiffs only allege a denial of equal access to, and safe use of, sidewalks, curb ramps, and parking areas *as public transportation*.  Furthermore, even if the court were to read a denial of speech rights into a complaint that is devoid of such allegations, the test for analyzing speech restrictions in "traditional public forums, such as public streets and parks," turns on whether the restriction is content-based or content-neutral.  Only content-based restrictions trigger the strict scrutiny standard of judicial review.  *See*, *e.g.*, *Christian Legal Society Chapter of the*

---

[31] *See e.g.*, *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 768 (1994) ("The state also has a strong interest . . . in promoting the free flow of traffic on public streets and sidewalks . . . ."); *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 696-97, (1992) (Kennedy, J., concurring) (observing that "the principal purpose of streets and sidewalks . . . is to facilitate transportation").

*University of California v. Martinez*, — U.S. —,130 S. Ct. 2971, 2984 n. 11 (2010) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)).  Absent clearer allegations of content-based restrictions on the First Amendment rights of free speech, assembly, and association, only rational basis scrutiny is implicated when analyzing the newly built or altered sidewalks, curb ramps, and parking areas at issue in this case.  In other words, and because access to easy and safe transportation on public streets is not a recognized fundamental right,[32] the scope of review for this part of plaintiffs' claim is limited to the "prohibition on irrational discrimination." *FIU*, 405 F.3d at 957.

### *ii.*    **History of unconstitutional discrimination**

As noted earlier, the second step in a Section 5 enforcement power analysis (*i.e.,* whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary) is not at issue in this case. Indeed, it is recognized by all parties that "the history of unconstitutional discrimination" is sufficient "to support Congress's determination that prophylactic legislation was necessary." *Garrett*, 531 U.S. at 365-370.  As the Supreme Court stated in *Tennessee v. Lane*, *supra*:

---

[32] The Supreme Court did find in *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147 (1939), that "[m]unicipal authorities . . . have the duty to keep their communities' streets open and available for movement of people and property." *Id*. at 150 (alteration supplied). However, "open and available" is a much lower bar than safe and handicap-accessible.

> "Discrimination against individuals with disabilities persists in such critical areas as . . . education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." This finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation.

541 U.S. at 529 (quoting 42 U.S.C. § 12101(a)(3)); *see also FIU*, 405 F.3d at 958

(stating, with regard to "Title II *as a whole*, . . . that Congress had documented a

sufficient historical predicate of unconstitutional disability discrimination in the

provision of public services . . . .") (emphasis in original).

### *iii*.   **Appropriate remedial measure**

The final step of the "congruence and proportionality" test requires the court to

evaluate whether ADA Title II is an appropriate remedial measure to enforce an

existing right, or an over-reaching attempt to make a substantive change in the right.

Here, the relevant "existing right" is to be free from irrational discrimination with

regard to renovated or newly built public sidewalks, curb ramps, and parking areas.

In the House Report published in conjunction with the 1990 enactment of the

ADA, Congressional inquiries and testimony showed that, before the ADA, "it [was]

clear that an overwhelming majority of individuals with disabilities lead isolated

lives." H.R. Rep. 101-485, pt. 2, at 34 (alteration supplied).  The report stated that

"[d]iscrimination   also   includes   harms   resulting   from   the   *construction   of*

24

*transportation, architectural, and communication barriers*." *Id* at 33 (emphasis supplied). The report labeled transportation as "the linchpin which enables people with disabilities to be integrated and mainstreamed into society," and recognized that "accessible transportation . . . promotes the self-reliance and self-sufficiency of people with disabilities. People who cannot get to work or to the voting place cannot exercise their rights and obligations as citizens." *Id*. at 37.

Responding to this history, Congress felt it necessary to employ the "limited remedy" of Title II, by which covered entities "retain their discretion to exclude persons from programs, services, or benefits for any lawful reason unconnected with their disability." *FIU*, 405 F.3d at 959. The reach of Title II is further limited in that it only requires renovations to sidewalks, curbs, and parking areas constructed after 1992. Additionally, Title II only requires "reasonable modifications." *Id.* at 532. "In no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service.*" Id.* (citing 28 C.F.R. §§ 35.150(a)(2), (a)(3)).

Considering the clear and persistent history of discrimination against persons with disabilities and the Congressional recognition of the importance of accessible streets, sidewalks, and parking areas, this court finds that Title II is a congruent and

proportional and, therefore, constitutional exercise of Section 5 enforcement power as applied to equal access to publically-maintained sidewalks, curb ramps, and parking areas.

### b.    Municipal administration facilities

The second category of claims includes the Public Services Building and the Huntsville Municipal Complex, both of which house the City's administrative offices. Defendant acknowledges that those two buildings can be considered separately from the other locations at issue.[33]

### i.    Constitutional right at issue

The facts as pled in the complaint make clear that plaintiffs have been denied equal access to municipal administration facilities.[34]  The primary purposes of such facilities include the provision of municipal government services and the conduct of local government business.  The logical inference drawn from these facts is that plaintiffs are being denied equal access to municipal government services and meetings based on their disability.  There is little, if any, doubt that denial of this equal access implicates the fundamental rights of speech, assembly, and association. "The

---

[33] Doc. no. 31, at 21.

[34] *See* Complaint ¶¶ 29(jj)-(lll).  Plaintiffs did not plead a specific constitutional deprivation within these buildings.  That is not fatal to their claims, however, because it would be improper for the court to require that level of detail in pleading when the recognized elements of a Title II case do not require such, and when there was no reasonable way, because plaintiffs were drafting their complaint, for them to anticipate that defendant would launch a constitutional challenge to the ADA.

very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937).  Denying citizens equal access to the main offices of local government based solely on their disability triggers the heightened scrutiny employed in *Tennessee v. Lane*, *supra*.

> ### ii.    History of unconstitutional discrimination and appropriate remedial measure

Because the Eleventh Circuit considers the second step of the *Boerne* test conclusively fulfilled with regard to Title II of the ADA,[35] the court will move on to address the third question:  that is, whether Title II is an appropriate remedial response in light of the historical background of discrimination.  Recognizing that the rights of free speech, assembly, and association are "violated by unreasonable and *unequal restrictions on access to public property*," the Supreme Court adopted a strict standard of judicial review of any actions that could hinder such rights in *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150 (1969) (emphasis supplied).  The Supreme Court has established that the freedoms of speech and assembly "are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624,

---

[35] *See FIU*, 405 F.3d at 958.

639 (1943).  Indeed, "the opportunity for free political discussion is a basic tenet of our constitutional democracy." *Cox v. State of Louisiana*, 379 U.S. 536, 552 (1965). Weighing the compelling nature of these fundamental rights against the "reasonable modifications" required by Title II, the court finds the requirements of Title II and its enacting regulations to be congruent and proportional when applied to equal access to municipal administrative facilities.

### c.   Entertainment and recreation venues

#### i.   Constitutional right at issue

While defendant characterizes the remaining locations at issue as "entertainment and recreation" facilities,[36] some of those facilities could also house educational programs and library resources.  That distinction is important as a theoretical matter, because the Eleventh Circuit recognizes a "vital," though "non-fundamental," right to equal access to education. *FIU*, 405 F.3d at 958.  As a practical matter, however, plaintiffs have not pled any facts to suggest that they have actually been denied access to such educational activities.  Absent more specific facts regarding unequal access to educational *services*, as opposed to unequal access to *facilities*, the court will regard the remaining locations at issue as venues for entertainment and recreation.

---

[36] This category includes The Historic Huntsville Depot, Sandhurst Park, Brahan Spring Park Natatorium, Joe Davis Stadium, Mastin Lake Park, Lakewood Community Center,  Dr. Richard Showers Sr. Recreation Center and Pool, and Burritt Museum.

The Eleventh Circuit has not addressed Title II's application to entertainment and recreation facilities. Even so, another court within this Circuit, the Northern District of Georgia, recently dealt with the issue in a case involving similar factual circumstances. *See Gaylor v. Georgia Department of Natural Res*ources, No. 2:11-CV-288, 2012 WL 3516489, *2-3 (N.D. Ga. Aug. 15, 2012).[37] The defendants in *Gaylor* argued that the plaintiff's claims should fail because there was "no separate constitutional right to 'access parks and recreation facilities.'" *Id*. at *3. As seen in *FIU*, however, a separate fundamental right is not necessary to allege a Title II action against irrational discrimination. Thus, the *Gaylor* court concluded that "legislation affecting disabled persons receives rational-basis review under the Equal Protection Clause." *Id*. at *5 (citing *Garrett*, 531 U.S. at 366-367). In like manner, this court finds that rational basis review applies in the context of equal access to municipally-owned and operated venues providing entertainment and recreational programs and services.

## *ii.* **History of unconstitutional discrimination and**

---

[37] The plaintiff in *Gaylor* was disabled, requiring the use of a cane or wheelchair for mobility, and pled architectural barriers to two Georgia state parks. His complaint included allegations of inaccessible parking, curb ramps, travel paths, and restrooms. *Gaylor,* 2012 WL 3516489, at *1. It should be noted that the Northern District of Georgia granted the defendant's motion for a more definite statement of the plaintiff's claims and, for that reason, did not conclude the three-part analysis. Even so, the *Gaylor* decision still is instructive on the issue of the appropriate standard of judicial review to be applied to restrictions on access to entertainment and recreation facilities.

appropriate remedial measure[38]

The next question is whether Title II, as applied to issues of equal access

entertainment and recreational venues, is an appropriate remedial measure for the

history of unconstitutional discrimination identified in the statute.  The right to equal

access in recreational settings is not as compelling as the right to equal access to

governmental administration and service facilities, or even the right to safe public

transportation routes.  Even so, Congress still addressed discrimination against people

with disabilities in the realm of recreational and entertainment venues during the

drafting of the ADA, even though most of the statutory references to recreation

involve Title III of the ADA, which applies to private accommodations.[39]  The eight

facilities at issue in the present part of the court's discussion do not fall under Title III,

because they are *public* facilities; nevertheless, they serve functions that are similar

to the privately owned facilities addressed in Title III.[40]  It would be illogical for

---

[38] As with the two preceding categories of locations and facilities addressed in this opinion, the second step of the *Boerne* inquiry is conclusively established, allowing the court to move to the third step.

[39] Title III applies to "private entities" such as hotels, restaurants, theaters, convention centers, retail stores, service establishments, public transportation hubs, museums, libraries, parks, zoos, private schools, social service centers, and exercise facilities. *See* 42 U.S.C. § 12181 (7). In contrast, Title II applies to public entities.

[40] While the court is not fully informed as to the extent and type of programs which occur at the facilities at issue, the court can make inferences as to the nature of activities.  For example, it is logical to infer that the Burritt Museum, if privately-owned, would be a "museum" as defined within Title III of the ADA.  *See* 42 U.S.C. § 12181(7).

30

Congress to prevent disability discrimination in privately owned accommodations, yet allow it to occur at the hands of local governments providing similar programs in similar public locations.  Moreover, that logical inconsistency would contradict the stated purpose of the ADA as a "'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'" *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (quoting S.Rep. No. 101-116, p. 20 (1989); H.R.Rep. No 101-485, pt. 2, p. 50 (1990)).  Further, because Title II only applies to remedy "irrational discrimination," and allows for great flexibility in determining the extent of the "reasonable modifications" required by the implementing regulations, a public entity like defendant is not unduly burdened by the statute's remedial requirements. Congressional investigations into the potential costs of Title II compliance have found that retrofitting older facilities does not have to be expensive,[41] and that building new facilities to be accessible is not a burden either.[42]  Thus, this court finds that, as applied

---

[41] "Numerous inexpensive changes can be made to make a facility accessible, including installing a permanent or portable ramp over an entrance step; installing offset hinges to widen a doorway; relocating a vending machine to clear an accessible path; and installing signage to indicate accessible routes and features within facilities." H.R.Rep. No 101-485, pt. 2, p. 35-36 (1990).

[42] "Several witnesses also recognized that newly constructed build-ups should be fully accessible because the additional costs for making new facilities accessible are often nonexistent or negligible. According to Michael Oestreicher, who directs an architectural firm that designs barrier-free environments, there is absolutely no reason why new buildings constructed in America cannot be barrier-free since additional cost is not a significant factor." H.R.Rep. No 101-485, pt. 2, p. 36 (1990).

to entertainment and recreational venues, Title II is a congruent and proportional exercise of Congressional power under Section 5.

**d.  Summary**

In summary, this court finds that, as applied to the facts at issue, Title II of the ADA is a valid exercise of Congress's enforcement power under Section 5 of the Fourteenth Amendment.  Accordingly, plaintiffs' ADA claim will survive defendant's motion to dismiss.

**2.  Is Title II a valid exercise of Congressional power under the Commerce Clause?**

Because this Court has found Title II, as applied to each of plaintiffs' claims, to be a valid exercise of Section 5 enforcement power under the Fourteenth Amendment, there is no need to determine Title II's constitutionality under the Commerce Clause of Article I of the United States Constitution.  "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010) (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 445 (1988)).

**C.  Do Plaintiffs Possess A Private Right Of Action To Enforce, for the Benefit of Disabled Individuals, the ADA Regulations Promulgated by the Attorney General?**

Defendants also argue that the "plaintiffs' claims must be dismissed to the extent that they are based upon or attempt to rely upon technical, abstract violations" of the regulations promulgated by the United States Attorney General for the purpose of implementing the ADA.[43]  It has been recognized that a regulation can "be enforced through the private right of action available under the organic statute that it implements." *Iverson v. City of Boston*, 452 F.3d 94, 100 (1st Cir. 2006) (citing *Alexander v. Sandoval*, 532 U.S. 275, 284-285 (2001)).  This application is limited, however, and excludes "regulations that go beyond what the statute itself requires." *Sandoval*, 532 U.S. at 293 n. 8.  As the Sixth Circuit has observed,

> a private plaintiff cannot enforce a regulation through a private cause of action generally available under the controlling statute if the regulation imposes an obligation or prohibition that is not imposed generally by the controlling statute. On the other hand, if the regulation simply effectuates the express mandates of the controlling statute, then the regulation may be enforced via the private cause of action available under that statute.

 *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004).

The Eleventh Circuit has applied the foregoing principles to bar any "freestanding private right of action to enforce a statute's implementing regulation unless Congress has clearly indicated, expressly or impliedly, to the contrary."

---

[43] Doc. no. 6, at 38.

*American Association of People with Disabilities v. Harris,* 605 F.3d 1124, 1133 (11th Cir. 2010), *opinion vacated upon rehearing on other grounds by American Association of People with Disabilities v. Harris,* 647 F.3d 1093 (11th Cir. 2011).[44] The Eleventh Circuit's opinion in *Harris* noted the specific provision of an enforcement remedy in the statutory language of the ADA itself, finding that "[t]he regulations, by contract, interpret and define the scope of the ADA," rather than provide any sort of private right of action that is already present in the statute. *Id.* (alteration supplied).

The First, Sixth, and Ninth Circuits reached the same conclusion, and based their opinions on *Sandoval.  See Iverson*, 452 F.3d at 100; *Ability Center*, 385 F.3d at 913; *Lonberg v. City of Riverside*, 571 F.3d 846 (9th Cir. 2009).  In *Ability Center v. Sandusky*, the plaintiffs asserted two ADA claims:  failure to install accessible curb ramps on renovated sidewalks; and, failure to apply the transition plan required by ADA regulations.  *Ability Center,* 385 F.3d at 902.  The Sixth Circuit, applying *Sandoval*, found that the defendant's failure to install accessible curb ramps when renovating streets and sidewalks gave rise to a valid claim for violation of the ADA, because the statutory language contemplated such injuries and remedies. *Id.* at 913. The court dismissed the plaintiffs' second claim, however, finding the defendant's

---

[44] While *Harris* has been vacated on re-hearing on other, factually-related grounds, the reasoning is still valid and persuasive.

failure to "develop a transition plan in violation of § 35.150(d) does not in and of itself similarly hinder the disabled." *Id.* at 914.

The Ninth Circuit agreed with the Sixth Circuit's reasoning, and denied the claim of a plaintiff who was attempting to enforce the transition plan required by 28 C.F.R. § 35.150(d). *Lonberg*, 571 F.3d at 852.

The First Circuit also denied a claim based on the transition plan regulation, as well as a claim of violation based on the ADA regulatory self-evaluation plan. *See Ability Center*, 452 F.3d at 101. That court pointed out the "important distinction" between claims that allege "violations of, and [a] concomitant right to enforce, the self-evaluation and transition plan regulations," on the one hand, and a claim asserting "a direct violation of Title II," on the other. *Id.* at 100 (alteration supplied).

Therefore, the task for this court is to determine whether plaintiffs' claims are based upon "express mandates of the controlling statute," *Ability Center,* 385 F.3d at 907, or "go beyond what the statute itself requires." *Sandoval*, 532 U.S. at 293, n. 8.

Like the plaintiffs in *Iverson*, the plaintiffs in the present case have based their claims on a mixture of the ADA regulations promulgated by the Attorney General, and remedies expressly provided in the statute itself. Plaintiffs reference both the transition plan and the self-evaluation required by 28 C.F.R. § 35.105, and claim that defendant's failure to develop and implement those plans has denied them their rights

35

to equal access under the ADA.[45]   As with similar claims addressed by the previously cited opinions of the First, Sixth, and Ninth Circuits, this part of the plaintiffs' claim in the present case is not enforceable as a private right of action.   Even so, the plaintiffs' ADA claim is not based solely on those regulations. Plaintiffs also allege defendant's failure to complete required structural changes needed for "equal program, service, or activity access,"[46] and claim discrimination "as prohibited by 42 U.S.C. §12101 *et seq*., and by failing to remove architectural barriers pursuant to 28 C.F.R. § 35.150(c)."[47]   While the lack of a self-evaluation or transition plan does not directly harm plaintiffs, defendant's failure to make reasonable modifications to eliminate or ameliorate structural barriers to equal access does directly harm plaintiffs in a manner anticipated by Title II.   This court agrees with the Sixth Circuit's conclusion that "Title II contemplates that such accommodations must sometimes come in the form of public entities removing architectural barriers that impede disabled individuals from securing the benefits of public services." *Ability Center,* 385 F.3d at 907.[48]   As a consequence, this court concludes that plaintiffs possess a valid and enforceable

---

[45] Complaint ¶¶ 10-12.

[46] *Id.* ¶ 13.

[47] *Id.* ¶ 20.   28 C.F.R. §35.150(c) demands that structural changes undertaken to existing facilities must be made either within three years of January 26, 1992, or "as expeditiously as possible."

[48] The Sixth Circuit, in *Ability Center*, found 28 C.F.R. §35.151 to be enforceable through a private cause of action. This regulation requires new construction and alternations to existing construction to be made accessible.

private right of action for their allegations of violations of the ADA, which fall under the express mandate of the statute.

For the foregoing reasons, plaintiffs' claim for a violation of Title II of the ADA is enforceable in this private cause of action as it pertains to the express mandate of Title II.  Plaintiffs' claim cannot be based on either the self-evaluation or transition plan regulations promulgated by the Attorney General, but the lack of compliance with those regulations can, nevertheless, be cited as evidence of overall ADA non-compliance.  In their request for relief, plaintiffs ask the court to direct defendant "to evaluate and neutralize its policies and procedures . . . to allow Defendant to undertake and complete corrective procedures."[49]  To the extent that plaintiffs are requesting this court to order compliance with the transition plan and self-evaluation regulations referenced in the complaint, the request is denied.  Even so, plaintiffs' claim is properly based on their allegations of discrimination in equal access and defendant's failure to reasonably modify structural barriers.

## V. CONCLUSION AND ORDERS

In accordance with the foregoing, defendant's motion to dismiss is GRANTED in part and DENIED in part.  Plaintiffs' Rehabilitation Act claim (Count II) is DISMISSED with prejudice, but the motion is denied as to plaintiffs' ADA claim

---

[49] Complaint ¶ 32.

(Count I).

The stay on discovery is lifted, and the parties are ORDERED to proceed with discovery pursuant to the Uniform Initial Order that will be entered contemporaneously herewith.  The parties should submit a report of their discovery planning conference on or before October 24th, 2012.

**DONE and ORDERED** this 10th day of October, 2012.

United States District Judge